## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter Seven |
| | ) | |
| PETER T. KITCHIN, | ) | Case No. Case No. 01 B 17814 |
| | ) | |
| Debtor. | ) | Honorable Jack B. Schmetterer |
| ROBERT TROOST, *et. al.* | ) | |
| Plaintiffs, | ) | Adversary No. 03 A 01204 |
| | ) | |
| v. | ) | |
| | ) | **HEARING DATE: June 17, 2004** |
| PETER T. KITCHIN, | ) | **10:30 a.m.** |
| Defendant. | ) | |

### NOTICE OF MOTION

TO:    See Attached Service List.

**PLEASE TAKE NOTICE** that on Thursday, June 17, 2004, at the hour of 10:30 a.m. we shall appear before the Hon. Jack B. Schmetterer, of the United States Bankruptcy Court for the Northern District of Illinois, or any Judge sitting in his place and stead, in courtroom 682, 219 South Dearborn Street, Chicago, Illinois, 60604, and then and there present the **MOTION FOR SANCTIONS PURSUANT TO RULE 9011 AND 28 U.S.C. § 1927**, a copy of which is attached hereto and hereby served upon you.

> HOWARD L. ADELMAN, ESQ. (ARDC# 0015458)
> NATHAN Q. RUGG, ESQ. (ARDC# 6272969)
> ADELMAN & GETTLEMAN, LTD.
> 53 W. Jackson Blvd., Suite 1050
> Chicago, IL 60604
> 312/435-1050

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Notice of Motion and a true copy of the document referred to therein were served upon the parties listed on the attached service list via hand delivery unless otherwise indicated, this 14th day of June, 2004.

_____
Nathan Q. Rugg, Esq.

FILED
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
JUN 1 4 2004
KENNETH S. GARDNER, CLERK
BY: DEPUTY- LS

## SERVICE LIST

Office of United States Trustee
227 West Monroe Street, Suite 3380
Chicago, IL 60603
Fax: 312-886-5794

David P. Leibowitz*
222 West Washington Street
Waukegan, IL 60085-5618
Fax: 847-249-9180

Ronald R. Peterson, Esq.
David E. Walters, Esq.
Peter J. Young, Esq.
Jenner & Block, LLC
One IBM Plaza
Chicago, IL 60611
Fax: 312-840-7516

Lawrence C. Rubin, Esq.
Gregory C. Ward, Esq.
Jared M. Wayne, Esq.
Shefsky & Froelich, Ltd.
444 N. Michigan Avenue
Suite 2500
Chicago, IL 60611
Fax: 312-527-4011

Steven R. Rappin, Esq.
Hauselman & Rappin, Ltd.
39 S. LaSalle Street
Suite 1105
Chicago, IL 60603
Fax: 312-372-0404

*Via Overnight Mail

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS

JUN 1 4 2004

KENNETH S. GARDNER, CLERK
PS REP. - LS

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| PETER T. KITCHIN, | ) | Case No. Case No. 01 B 17814 |
| | ) | |
| Debtor. | ) | Honorable Jack B. Schmetterer |
| ROBERT TROOST, *et. al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adversary No. 03 A 01204 |
| | ) | |
| PETER T. KITCHIN, | ) | **HEARING DATE: June 17, 2004** |
| | ) | **10:30 a.m.** |
| Defendant. | ) | |

## <u>MOTION FOR SANCTIONS PURSUANT TO RULE 9011 AND 28 U.S.C. § 1927</u>

NOW COMES the debtor and the defendant herein, PETER T. KITCHIN (the "Debtor"),

by and through his undersigned attorneys, and pursuant to Rule 9011of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"),  Rule 11 of the Federal Rules of Civil

Procedure ("Civil Procedure Rules"), 11 U.S.C. § 105 and 28 U.S.C. § 1927, hereby moves this

Court for the entry of an order:  (i) for an award in favor of the Debtor and against plaintiffs

Robert Troost ("Troost") and Mount Hope Cemetery Association, Inc. ("Mount

Hope")(collectively, the "Plaintiffs") for costs and expenses; and (ii) an award for sanctions

against the Plaintiffs and their counsel for the filing of a frivolous lawsuit and for the

unreasonable and vexatious prosecution of the same (the "Motion").  In support of the Motion,

the Debtor respectfully states as follows:

61981.1  6/14/04

## I.    INTRODUCTION AND SUMMARY OF RELIEF SOUGHT BY THE MOTION

1.     The above-captioned dischargeability proceeding was not filed in good faith, and improperly used this proceeding, this Court and the bankruptcy forum solely as a litigation tactic of delay and pressure to gain an advantage in their Counterclaim/Third-Party Complaint (hereinafter defined) in a lawsuit currently pending in the Circuit Court of the Twelfth Judicial Circuit, Will County, Illinois (the "Gateway Litigation"). The Counterclaim/Third-Party Complaint names the Debtor's wife, Carmel Kitchin, as a third-party defendant, and further implicates the Debtor and his wife in allegations that are substantially identical to those previously at issue in the Second Amended Complaint herein. Plaintiffs' maneuver, designed to pressure Debtor's wife to capitulate in the Gateway Litigation, has now **backfired**. They cannot now escape the consequences of using this dischargeability proceeding for such an improper purpose.

2.     The use of a lawsuit as a means to delay and harass alone is sanctionable under Civil Procedure Rule 11 and Bankruptcy Rule 9011. The conduct of the Plaintiffs and their attorneys, however, is far more devious. Some of the counts of the Second Amended Complaint and the allegations upon which they are premised are untenable under existing law; others have no basis in fact. To put it most simply, the Plaintiffs have made allegations they knew to be untrue. Plaintiffs' counsel has exacerbated this sanctionable conduct by repeatedly advocating their client's frivolous position in multiple pleadings and various court hearings.

3.     At no time over the approximate fourteen (14) months since the filing of the Second Amended Complaint did the Plaintiffs ever intend to prosecute their action through trial. Instead, they utilized compound delay tactics by (a) delaying the filing of the adversary

proceedings for well over a year, (b) putting forth a minimalist effort in the prosecution of their

case, and (c) failing to cooperate with the Debtor's discovery by refusing to answer written

discovery and by engaging in egregious deposition conduct.

      4.      Plaintiffs and their counsel rode the coattails of the Trustee in his pursuit of § 727

discharge proceeding against the Debtor (the "Trustee Litigation").  After the settlement of

Trustee Litigation, the Plaintiffs found themselves in the unenviable position of having to

actually incur expense and time to divine a factual basis for the allegations of the Second

Amended Complaint.

      5.      Conversely, the Debtor engaged a zealous and thorough discovery endeavor.   The

Debtor's discovery at one point resulted in two (2) motions to compel and one (1) motion for

protective order simultaneously before the Court.  In the face of pressure by the Debtor's motions

and a basic inquiry by the Court to account for their delay tactics, the Plaintiffs chose to bow out

of this proceeding in its entirety, **volunteering** to drop their case **with prejudice**.[1]  In attempt to

explain the Plaintiffs' total capitulation, counsel had the temerity and gall to accuse the Debtor of

creating a "discovery circus" and to allege that the Plaintiffs could not share in the Trustee's

previous discovery efforts.[2]

---

[1] In fact, Plaintiffs' dismissal with prejudice has made their problems exponentially
worse, as under Illinois law, a dismissal with prejudice amounts to an abandonment of the
plaintiffs' claims and rights as a matter of law and constitutes an adjudication on the merits. The
dismissal with prejudice invokes the doctrines of *res judicata* and collateral estoppel in the
Gateway Litigation, which should lead to the dismissal with prejudice of the Counterclaim/Third-
Party Complaint.

[2] Plaintiffs' counsel intimated at the Court hearing on May 6,2004, that the Plaintiffs were
somehow precluded from participating in the Trustee's formal and informal discovery, and
investigation of the Debtor. This was a deliberate attempt to mislead the Court. First, the
Plaintiffs were not precluded in any respect from participating in the comprehensive efforts of the

6.      To add insult to injury, the Debtor understands and believes based on Hope Carmel's hand written expense ledgers maintained by Troost himself, that Troost and Mount Hope have improperly used funds from Hope Carmel, LLC, an entity owned by Troost and Carmel Kitchin (the "LLC"), to pay their attorneys fees in this matter. The Plaintiffs have thus used the funds of a company 50% owned by Carmel Kitchin to underwrite the costs of litigation against her husband in attempt to better Plaintiffs' position in the Counterclaim/Third-Party Complaint against Carmel Kitchin herself.

7.      The Debtor accordingly seeks pursuant to Bankruptcy Rule 9011 and 28 U.S.C. § 1927, an award of costs and fees for costs incurred in defending the Plaintiffs' frivolous lawsuit and in bringing this motion, as well as sanctions against Plaintiffs and their counsel as a consequence for their filing this meritless litigation.

## II.    FACTUAL BACKGROUND

### A.    Transactions Surrounding the Mokena Properties

8.      Prior to the filing of the Debtor's bankruptcy petition, Troost[3] provided financial accommodations and participated as an investor in several real estate ventures with the Debtor. The Debtor provided his experience and expertise in the managing, developing, and selling many of the real properties in which Troost acted as an investor and/or financier.

---

Trustee. They simply did not care to participate, choosing rather to rely totally on the Trustee's efforts. Secondly, and perhaps more indicative of the attitude of the Plaintiffs, no effort was made by the Plaintiffs to pursue a Rule 2004 examination, or any other discovery in the Bankruptcy Case.

[3] Robert Troost is an experienced businessman at one time owning and managing more than thirty (30) income producing companies or real estate entities. Mr. Troost has a net worth of in excess of $30,000,000.00, and is considered by his accountant to be business savy and a "hands on" manager of his business interests.

-4-

9.      At some time in 1998, the Debtor discussed a concept with Troost concerning certain real property in Mokena, Illinois, consisting of a shopping plaza commonly known as 19081 Old LaGrange Road, Mokena, Illinois (the "Plaza"), and an office building commonly known as 19001 Old LaGrange Road, Mokena, Illinois (the "Office Building")(collectively, the "Mokena Properties").

10.      Thereafter, Troost, through Mount Hope and Carmel Kitchin, through CII, agreed to form a partnership to purchase and develop the Mokena Properties. Troost, Mount Hope, CII, and Carmel Kitchin memorialized their agreement terms pursuant to that certain agreement dated May 15, 1998 (the "Partnership Agreement"). A copy of the Partnership Agreement is attached hereto as Exhibit A, and made a part hereof.

11.      Under the Partnership Agreement Troost and Mount Hope agreed to provide certain financial accommodations to purchase the Mokena Properties. Both Troost **and Carmel Kitchin** agreed (a) to obtain a loan in an amount sufficient to finance the acquisition and tenanting of the Mokena Properties in the total amount of $7,741,640.90, (b) to guaranty such financing, and (c) to each be responsible for fifty percent (50%) of the obligations related to the Mokena Properties, **including any financing obligations**. (Exhibit A, ¶¶5-6)(emphasis added).

12.      Carmel Kitchin and Troost, through Mount Hope, formed the LLC to purchase, own, and manage the Mokena Properties. The Mokena Properties constituted the principal asset of the LLC. Carmel Kitchin and Mount Hope each hold fifty percent (50%) of the ownership interests of the LLC.

13.      On or about May 29, 1998, Carmel Kitchin, Troost, and the Debtor entered into an agreement as to services provided by the Debtor to the LLC related to the Mokena Properties.

Pursuant thereto, CII and Carmel Kitchin agreed to use the Debtor and certain of his subchapter-S corporations to perform contracting and management services for a margin of not more than twenty-seven percent (27%). In addition, the Debtor agreed to manage the Mokena Properties for a fee of five percent (5%) of gross revenues, and CII and Mount Hope agreed to pay the Debtor a finder's fee of $200,000 related to the Mokena Properties.

14.     Since the LLC's acquisition of the Mokena Properties and through the present, Troost maintained complete control of the finances of the Mokena Properties. For each of the years 1998, 1999 and 2000, Troost provided Mrjenovich and Associates ("M&A"), the accountants for numerous of Troost's real estate entities for over twenty (20) years), with all of the LLC's financial information upon which M&A relied to file the LLC's tax returns and prepare its financial statements. Troost reviewed the LLC financial statements and discussed them with M & A. Troost further (a) tracked the LLC's income, (b) paid its expenses, (c) maintained its checkbook, (d) signed all checks for the LLC, and (e) kept possession of all of its books and records, including cancelled checks, bank statements, receipts and disbursements. In fact, Troost kept most if not all of the ledgers for the LLC in his own handwriting.[4]

---

[4] In the face of Troost's sole control of the finances of the LLC described above, Plaintiffs alleged in paragraph 12 of the Second Amended Complaint:

> 12.     In this fiduciary capacity, the Debtor was entrusted with control over, and responsibility for, paying the day-to-day expenses related to the Mokena Properties using partnership funds as well as finding and negotiating with potential purchasers of the Mokena Properties.

This is but one of many allegations contained in the Second Amended Complaint contradicted by the true facts. How can the Plaintiffs allege in good faith that the Debtor was "paying the day to day expenses relating to the Mokena Properties using partnership funds" when Troost maintained signing authority for and control of the LLC checking accounts, as well as kept all the LLC business records?

15.    In the late summer of 1999, Troost encouraged the Debtor to look for a purchaser for the Mokena Properties. As a result of the Debtor's efforts the LLC entered into various real estate contracts with third parties to buy the Office Building and the Plaza, some of which could not be consummated.

16.    On or about November 17, 1999, Gateway Services of Illinois, Inc. ("Gateway") and the LLC executed a contract to sell Gateway all of Mount Hope's beneficial interest (i.e. 50%) in the Mokena Properties. Troost executed the Gateway Contract on behalf of Mount Hope. Gateway and Mount Hope subsequently modified that real estate sale contract in June 2000, thereby agreeing to a sale of the Office Building only (the "Modified Sales Contract"). Troost also signed the Modified Sale Contract on behalf of Mount Hope. The Modified Sale Contract established that Gateway would purchase **only Mount Hope's 50% interest** in the Office Building **for $4,000,000.** Gateway, Mount Hope and Carmel Kitchin subsequently entered into the First Amendment to Real Estate Contract on or about August 31, 2000, which modified and clarified the previous two agreements (the "Amended Sales Contract"). Despite the addition of various terms and conditions to the sale, the sale price for Mount Hope's interest in the Office Building **remained at $4,000.000.**

17.    In early September 2000, Mount Hope and Troost and other parties with related interests (collectively, the "Troost Parties") entered into that certain "Settlement Agreement and Mutual General Release" dated August 31, 2000 (the "Comprehensive Settlement Agreement") with Carmel Kitchin, the Debtor and two of the Debtor's business entities (collectively the "Kitchin Parties"). A copy of the Comprehensive Settlement Agreement is attached hereto as

-7-

Exhibit B, and made a part hereof. The Troost parties were represented in the negotiations leading to the Comprehensive Settlement Agreement by attorney Kenneth Brown, and the Kitchin Parties were represented by attorney Bruce Salk. Both Brown and Salk were experienced real estate attorneys with dozens of years of experience. The negotiations included the exchange of several drafts and proposed language.

18.     The Settlement Agreement stated that "a disagreement has risen with respect to the Troost Parties and the Kitchin Parties regarding the development and sale of the Plaza and Office Building and the parties desire to resolve their differences and settle any and all disputes between themselves pursuant to the terms and provisions hereof." (Exhibit B, p. 1). In the Settlement Agreement, Mount Hope agreed to enter into the Amended Sales Contract and "thereafter covenants and agrees to fulfill its obligations and agreements [thereunder]." (Exhibit B, p. 2).

19.     Mount Hope and Troost did not fulfill its obligations under the Amended Sales Contract, and thus forced Gateway to file a lawsuit in the Circuit Court of the 12th Judicial Circuit against Mount Hope and the Chicago Trust Company (the "Gateway Complaint"). The Gateway Complaint, filed March 12, 2001, requests specific performance of the Amended Sales Contract, and also contains a count for breach of contract.

20.     Mount Hope subsequently filed a Motion to Join Additional Parties and their first Counterclaim/Third-Party Complaint (the "Counterclaim/Third-Party Complaint"), whereby Troost joined the litigation as a Third-Party Plaintiff and Carmel Kitchin and CII became Third-Party Defendants. A copy of the Counterclaim/Third-Party Complaint, without exhibits, is attached hereto as Exhibit C, and made a part hereof. Mount Hope alleged that the Debtor would

-8-

have be named a defendant in the Counterclaim/Third-Party Complaint but for the filing of the

Petition. (Exhibit C, ¶1).

21.     A trial date for both the Gateway Complaint and the Counterclaim/Third-Party

Complaint is currently scheduled in September 2004.

**B.     The Bankruptcy**

22.     The Debtor initiated the underlying bankruptcy (the "Bankruptcy Case") by filing

a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on May 16, 2001 (the

"Petition"). The Debtor listed Troost and his business entities on Schedule F as holding an

unsecured claim in an unknown amount.

23.     On November 21, 2001 the Plaintiffs moved to adopt that certain Motion to

Extend Time Within Which to Object to Dischargeability of Debt or to Discharge (the "Motion

to Extend") filed by the trustee of the bankruptcy estate of Peter T. Kitchin (the "Trustee"). The

Court granted both the Plaintiffs' motion and the Motion to Extend. The Trustee subsequently

filed a second Motion to Extend and the Plaintiffs similarly moved to adopt the motion. The

Court granted both motions.

24.     Thereafter the Trustee filed a Complaint against the Debtor seeking to bar the

discharge of the debt allegedly owed by the Debtor pursuant to 11 U.S.C. § 727. On January 6,

2003 the Trustee filed an Amended Complaint (the "Trustee Complaint"). A copy of the Trustee

Complaint, without exhibits, is attached hereto as Exhibit D, and made a part hereof. The

Trustee Complaint included three counts objecting to discharge, including Count I pursuant 11

U.S.C. § 727(a)(3), Count II pursuant to 11 U.S.C. § 727(a)(5), and Count III pursuant 11 U.S.C.

§ 727(a)(2)(A).

25.     The Plaintiffs filed two additional motions over the following year, each seeking a six (6) month extension of the deadline to file claims objecting to discharge or dischargeability. The Court granted each of the motions in turn and established April 1, 2003, as the extended deadline to file objections to discharge and dischargeability (the "Objection Deadline").

26.     Neither Troost or Mount Hope filed a claim in the underlying bankruptcy.

## C.     The Plaintiffs' Complaints

27.     On the day of the Objection Deadline, the creditors Troost, Mt. Hope Cemetery, and the LLC (collectively, the "Plaintiffs") filed a complaint against the Debtor (the "Initial Complaint") seeking a determination that certain debts allegedly owed by the Debtor to the Plaintiffs are non-dischargeable under § 523 and to deny the Debtor a discharge under § 727(a)(3) and § 727(a)(5). A copy of the Initial Complaint is attached hereto as <u>Exhibit E</u>, and made a part hereof.

28.     The Debtor moved to dismiss Counts I and II of the Initial Complaint, arguing the Initial Complaint contained only broad, conclusory allegations of fraud in violation of Bankruptcy Rule 7009(b) and improperly made numerous allegations based upon "information and belief." After briefing and oral argument on July 21, 2003, the Court entered an order striking Counts I and II of the Initial Complaint in their entirety, and granting the Plaintiffs leave to file an amended complaint.

29.     The Plaintiffs filed an Amended Complaint on August 19, 2003 (the "Amended Complaint"). The Debtor again moved to dismiss Count I and II of the Amended Complaint, arguing the substantive defects of the Initial Complaint remained wholly uncured. The Amended Complaint also relied heavily on allegations based upon "information and belief." Upon

reviewing the briefs and hearing oral argument on November 10, 2003, the Court agreed, and again entered an order striking Counts I and II of the Amended Complaint in their entirety.

30.      The Plaintiffs filed their Second Amended Complaint on December 1, 2003 (the "Second Amended Complaint"). A copy of the Second Amended Complaint is attached hereto as Exhibit F, and made a part hereof. Counts I-III of the Second Amended Complaint seek a determination that certain debts owed to Plaintiffs are non-dischargeable under § 523(a)(2)(A), (a)(4) and (a)(6). Section 523(a)(2)(A) provides that debts "to the extent obtained by false pretenses, a false representation, or actual fraud" are not dischargeable. 11 U.S.C. § 523(a)(2)(A). Section 523(a)(4) provides that debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" are not dischargeable. 11 U.S.C. § 523(a)(4). Counts IV and V allege violations of § 727(a)(3) (concealment or failure to preserve records) and under § 727(a)(5) (failure to explain loss of deficiency of assets).

31.      The Debtor moved to dismiss Counts I and II of the Second Amended Complaint, noting that it remained inadequate under Rule 7009 and also questioning how the Plaintiffs' could legitimately remove **all** qualifications of allegations as being based upon "information and belief." After hearing argument, the Court entered an order denying the Debtor's motion to dismiss Counts I and II, but *sua sponte* ordered pursuant to Bankruptcy Rule 7012 that Plaintiffs file a More Definite Statement as to certain allegations contained in paragraphs 16 and 17 of the Second Amended Complaint.

32.      The Plaintiffs filed a More Definite Statement on January 26, 2004. On February 9, 2004, the Debtor filed his Combined Amended Answer of Peter T. Kitchin to Counts I and II of the Second Amended Complaint and Answer to More Definite Statement.

33.    In support of the allegations of the More Definite Statement the Plaintiffs referenced an appraisal performed in 1996. The Plaintiffs did not reference said appraisal in the Initial Complaint, the Amended Complaint or the Second Amended Complaint, nor did they allege that the Debtor received and reviewed the Appraisal, or even had any knowledge of its existence.

**D.    Entry of Preliminary Pretrial Scheduling Order and Final Pretrial Order**

34.    On February 17, 2004, the Court entered a Preliminary Pretrial Scheduling Order and a Final Pretrial Order closing discovery on May 17, 2004, and setting the matter for trial on June 21, 22 and 24, 2004. The Final Pretrial Order shortened to seven (7) days all times for notice and responses related to discovery.

**E.    Plaintiffs' Voluntary Dismissal With Prejudice**

35.    On May 6, 2004, while attending a hearing on three (3) discovery motions brought by the Debtor, Plaintiffs' counsel informed this Court that they would prefer to dismiss the Second Amended Complaint with prejudice rather than respond to the outstanding discovery.

36.    Having thus surrendered in open court shortly before noon, the Counter-Plaintiffs had a motion to dismiss on file later that afternoon[5] (the "Motion to Dismiss"), which was granted as to Counts I-III by the Bankruptcy Court on May 7, 2004, subject to the retention of jurisdiction to consider any motion by Debtor with respect to the assessment of costs, fees, or sanctions. The Court entered an order dismissing Counts IV and V after the Plaintiffs provided the requisite twenty (20) day notice to all creditors in the Bankruptcy Case.

---

[5]  Fed.R.Civ.P. 41 and Fed.R.Bankr.P. 7041 govern Motions to Dismiss and require court approval of a motion to dismiss an action brought subsequent to the filing of an answer to the complaint at issue.

## III.    STATUTORY BASIS FOR RELIEF SOUGHT

### A.    Civil Procedure Rule 11 and Bankruptcy Rule 9011

37.    Bankruptcy Rule 9011 imposes four requirements on an attorney or party signing a motion or pleading: (1) there must be reasonable inquiry into both fact and law; (2) there must be good faith, meaning that paper may not be interposed to harass; (3) a legal theory must be objectively warranted by existing law or good faith argument for modification of existing law; and (4) the lawyer must believe that a complaint is well grounded in fact.  In re International Oriental Rug Center, Inc., 165 B.R. 436, 441 (Bankr.N.D.Ill. 1994)(J. Schmetterer).  The Debtor will show that the Plaintiffs' and their counsel failed to fulfill at least three (3) of the above requirements.

38.    There are both objective and subjective components to Rule 9011.  See Id. (citing Mars Steel Corp. v. Continental Bank, N.A. 880 F.2d 928 (7th Cir. 1989)).  A pleading based on existing law and supported by facts is nonetheless sanctionable if it is brought for an improper purpose.  See Id.  At the same time, "a paper filed with the purest of intentions is sanctionable if a reasonable inquiry was not made beforehand." Id.

39.    Sanctions under Rule 9011 may be imposed against both an attorney and the party he represents.  See In re Val W. Poterek & Sons, Inc., 169 B.R. 896, 909 (Bankr.N.D.Ill. 1994)(J. Schmetterer), and In re Collins, 250 B.R. 645, 656 (Bankr.N.D.Ill. 2000).

40.    Bankruptcy Rule 9011 is essentially identical to Civil Procedure Rule 11, and Rule 11 precedents may be applied to make decisions under Bankruptcy Rule 9011.  See Id. at 659.

### B.    11 U.S.C. § 105

41.     The Court has broad powers pursuant to 11 U.S.C. § 105, to sanction all parties involved conduct that violates Bankruptcy Rule 9011. See Collins, supra, 250 B.R. at 656. "Courts may resort to their inherent powers, rather than specific rules and statutes, where broad authority is necessary to ensure that all culpable parties receive an appropriate sanction." Id. Accordingly, this Court may utilize Section 105 to sanction conduct that abuses the judicial process and unnecessarily multiplies proceedings in the bankruptcy case. See Id.; see also Volpert v. Ellis, 110 F.3d 494 (7th Cir. 1997)(Affirming decision wherein bankruptcy court sanctioned attorney who unreasonably and vexatiously multiplied proceedings by exercising its authority to enter any necessary or appropriate order under 11 U.S.C. § 105(a)).

C.     **28 U.S.C. § 1927**

42.     28 U.S.C. § 1927 provides a means to assess costs, expenses and fees against an attorney who unreasonably multiplies the proceedings in a case:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927.

43.     This Court previously ruled that a bankruptcy court holds the power to sanction under § 1927. Volpert v. Ellis, 177 B.R. 81 (Bankr.N.D.Ill. 1995)(J. Schmetterer)(aff'd on different grounds, 110 F.3d 494 (1997).

44.     Section 1927 sanctions are appropriate "where an attorney 'has acted in an objectively unreasonable manner . . . . where a claim is without plausible factual or legal basis and lacking in justification.'" Id. (citing Walter v. Fiorenzo, 840 F.2d 427, 433 (7th Cir. 1988)).

## IV.   VIOLATIONS OF BANKRUPTCY RULE 9011

### A.   Adversary Proceeding Brought for Improper Purpose, Solely to Harass Debtor and Delay Bankruptcy Case

45.     A party may not file an adversary proceedings for the purpose of harassing a Debtor or for delay. See Fed.R.Bankr.P. 9011(b)(1).   In determining whether a filing was interposed for improper purpose within meaning of Bankruptcy Rule 9011, the Court's focus is on what a party intended, and on what a party knew or should have known on the day the paper was filed. See Collins, supra, 250 B.R. at 662. This is a fact specific analysis. See Id.

46.     As will be shown below, the Plaintiffs used the Bankruptcy Case to file a meritless adversary proceeding, seeking to thereby delay the Debtor's bankruptcy and pressure a resolution of the Gateway Complaint.  With the backdrop of the pending Gateway Litigation, the Plaintiffs affirmative delay in filing an action in the Bankruptcy Case, their lack of discovery efforts and their ultimate failure to prosecute their Second Amended Complaint presents a clear violation of Bankruptcy Rule 9011(b)(1).

### 1.   Two Years to File Initial Complaint

47.     A comparison of the Initial Complaint and the Counterclaim/Third-Party Complaint shows that the Initial Complaint contained nearly three dozen allegations identical to those of the Counterclaim/Third-Party Complaint:

| Counterclaim/Third-Party Complaint | INITIAL COMPLAINT |
|---|---|
| Paragraph 2 | Paragraphs 18 & 19 |
| Paragraph 10 | Paragraph 12 |
| Paragraph 11 | Paragraph 13 |

| | |
|---|---|
| Paragraph 12 | Paragraph 14 |
| Paragraph 13 | Paragraph 20 |
| Paragraph 14 | Paragraph 21 |
| Paragraph 15 | Paragraph 22 |
| Paragraph 16 | Paragraphs 23 and 24 |
| Paragraph 18 | Paragraph 26 |
| Paragraph 19 | Paragraph 27 |
| Paragraph 20 | Paragraph 28 |
| Paragraph 21 | Paragraph 29 |
| Paragraph 22 | Paragraph 30 |
| Paragraph 23 | Paragraph 31 |
| Paragraph 24 | Paragraph 32 |
| Paragraph 25 | Paragraph 33 |
| Paragraph 26 | Paragraph 34 |
| Paragraph 27 | Paragraph 35 |
| Paragraph 28 | Paragraph 36 |
| Paragraph 29 | Paragraph 37 |
| Paragraph 30 | Paragraph 38 |
| Paragraph 31 | Paragraph 39 |
| Paragraph 32 | Paragraph 40 |
| Paragraph 33 | Paragraph 41 |
| Paragraph 34 | Paragraph 42 |
| Paragraph 35 | Paragraph 43 |
| Paragraph 36 | Paragraph 44 |
| Paragraph 37 | Paragraph 45 |
| Paragraph 38 | Paragraph 46 |

61981.1  6/14/04

| Paragraph 39 | Paragraph 47 |
|---|---|
| Paragraph 40 | Paragraph 48 |
| Paragraph 41 | Paragraph 49 |
| Paragraph 42 | Paragraph 50 |
| Paragraph 43 | Paragraph 51 |

48.    The allegations supporting the§ 523 counts of the Initial Complaint and the Counterclaim/Third-Party Complaint are nearly identical, differing only in the wording of certain allegations and the different causes of actions available under state law and federal bankruptcy law (though both pleadings contain counts for fraud and breach of fiduciary duty).   These pleadings allege the same fraud in the same real estate transactions by the same parties.

49.    The only substantive difference between the Counterclaim/Third-Party Complaint and the Initial Complaint is the latter's inclusion of two § 727 actions.  However, the Plaintiffs simply rehashed the Trustees' § 727 counts (pled by the Trustee one year prior) and partially or wholly replicated the relevant allegations of Trustee Complaint.  A cursory review of the following allegations of the Trustee Complaint and the Initial Complaint underscores another unabashed copy job on the part of the Plaintiffs:

| TRUSTEE COMPLAINT | INITIAL COMPLAINT |
|---|---|
| Paragraph 8 | Paragraph 6 |
| Paragraph 9 | Paragraph 7 |
| Paragraph 11 | Paragraph 8 |
| Paragraph 42 | Paragraph 52 |
| Paragraph 43 | Paragraph 53 |
| Paragraph 44 | Paragraph 54 |

| Paragraph 45 | Paragraph 55 |
|---|---|
| Paragraph 46 | Paragraph 56 |
| Paragraph 47 | Paragraph 57 |
| Paragraph 48 | Paragraph 58 |
| Count I (in its entirety) | Count IV (in its entirety) |
| Count II (in its entirety) | Count V (in its entirety) |

50.    Despite the overwhelming similarities by their two pleadings, the Plaintiffs delayed nearly two (2) years after the Petition to file the Initial Complaint.  What makes this delay so egregious is that the Plaintiffs sought a total of four (4) extensions before filing a complaint they eventually borrowed **lock, stock and barrel** from the Trustee.  Specifically, the Plaintiffs had the entire blueprint  -and most of the allegations word for word– for the Initial Complaint laid out for them by the time the Trustee filed the Trustee Complaint on March 28, 2002.  Thereafter, the Plaintiffs nonetheless requested a total twelve (12) month extension via two separate motions, and filed the Initial Complaint on the last day of the Objection Deadline.

51.    It is apparent that the Plaintiffs purposely delayed filing the Initial Complaint, an obvious cut and paste job, in an effort to extend the underlying Bankruptcy Case.

### 2.    Plaintiffs Engaged in a Trivial Discovery Effort To Further Delay the Bankruptcy Case

52.    The Plaintiffs' stall tactics manifested themselves in the discovery process as well. The Pretrial Orders established a three (3) month discovery period ending May 17, 2004 (the "Discovery Period").

53.    The only discovery initiated by the Plaintiffs during the Discovery Period consisted of the depositions of the Debtor and Carmel Kitchin.  In addition to these depositions,

the sum of the Plaintiffs' discovery "efforts" included the attendance at the deposition of Glen

Mrjenovich (at which Plaintiffs' counsel asked no questions) and defending the deposition of

Kenneth Brown[6] (the "Brown Deposition"). Tellingly, the Plaintiffs did not propound any

interrogatories, requests for production, requests to admit, subpoenas *duces tecum* **or any**

**written discovery at all** in connection with either their § 523 or § 727 actions.

54.    The lack of action on part of Plaintiffs' counsel in defending the Brown

Deposition further served to delay the adjudication of the Second Amended Complaint and

forced the Debtor to incur additional attorneys fees. That is, Plaintiffs' counsel did little if

anything to control Mr. Brown's[7] egregious and disruptive behavior during the deposition, thus

requiring the Debtor to bring a Motion to Compel Brown's continued deposition and to set

guidelines for the same (the "Motion to Compel"). While Plaintiffs' Motion to Dismiss

intervened before a complete hearing on the Motion to Compel, the Court cautioned Plaintiffs'

counsel as follows:

> Now, on the other motions, with regard to Mr. Brown you're going to have to get a
> control on your client. He is not to be raising substantive [objections]. That's your
> job. If you're going to represent him, and you were representing him in this, he has
> made this a more complex analysis because he's the one that's doing the objecting.
> He has no business doing the objecting . . . . You're going to have to have a heart to
> heart talk with him about just waiting for you to guide him and to instruct him at the
> deposition.
>
> (Transcript of May 6, 2004 Hearing.)   A copy of the relevant portions of the
> transcript is attached hereto as Exhibit G, and made a part hereof.

---

[6] Kenneth Brown represented Troost and Mount Hope in the negotiations leading to the
Settlement Agreement including, marking up drafts, suggesting proposed language, and face to
face negotiations.

[7] Plaintiffs' counsel represented Mr. Brown during the deposition and in the ensuing
Motion to Compel filed by the Debtor.

55.     Plaintiffs' counsel lack of control was particularly irresponsible in light of the fact that the Court had already ruled on the relevancy of certain deposition topics to which Mr. Brown refused to respond. Specifically, this Court has previously found Troost's real estate holdings and experience to be discoverable. On April 19, 2004, counsel for both the Debtor and Plaintiffs appeared before the Court on Debtor's Motion to Set Deposition Scope (the "Deposition Hearing"). A copy of the relevant portions of the transcript is attached hereto as <u>Exhibit H</u>, and made a part hereof. At the Deposition Hearing the Court stated "Counsel is on notice that as far as I'm concerned you may inquire into [Troost's] real estate experience and holdings prior to the August representation. If he wants to object to that in the light of that ruling and risk the sanctions that are likely to come, he may do so." (<u>Exhibit H</u>, p. 12). After receiving these clear instructions from the Court, it was incumbent upon counsel to have instructed his client to answer questions regarding these matters during the Brown Deposition.

56.     Plaintiffs' counsel also failed to provide responses to certain of the written discovery propounded by the Debtor. The Debtor served Plaintiffs with his First Set of Interrogatories and First Request for Production of Documents on April 26, 2004. Plaintiffs provided no answers to either discovery requests by May 5, 2004, as required by the Final Pretrial Order, thereby again evincing their intent not prosecute the Second Amended Complaint. By non-suiting the case the Plaintiffs also avoided the deadline to respond to the Debtor's Second Set of Interrogatories and Second Request for Production of Documents, as well as the need to defend Robert Troost's deposition. Plaintiffs additionally failed to provide adequate responses to three (3) of the eight (8) requests to admit propounded by the Debtor, again forcing the Debtor to

incur additional costs to bring another motion to compel and providing further impetus to run

away from their case.

### 3.   Failure to Prosecute Second Amended Complaint

57.    The idle "prosecution" of the Second Amended Complaint is well documented

above. The lack of effort culminated in the loud signal of retreat sounded by Plaintiffs' counsel

at a May 6, 2004 hearing, at the moment the Court began to press counsel to substantively

respond to the several motions to compel brought by the Debtor:

> MR. WAYNE: This is a related but not brought to your attention topic, and that
> is we have a . . . . parallel case in the state court in Joliet. We, in this case, have
> been, up until the trustee bowed out, trying to coordinate efforts with the trustee in
> order to make this case economically feasible. **If you're inclined to, and it
> sound like you are, to have Ken Brown come back in for another deposition
> under these circumstances - -** you know, Mr. Adelman's terminated three
> depositions. **There's a lot more work to do in the next few weeks or the next
> week-and-a-half actually, partly because of his conduct. If we're going to be
> subjected to that, frankly, we've been considering it since the trustee settled,
> and we may nonsuit this case.** And - -
>
> THE COURT: When, as and if you want to make a motion to dismiss the case and
> serve notice, I'll hear it. Until then, we'll go forward.
>
> MR. WAYNE: **I'll file it today.**
>
> THE COURT: You're going to file it?
>
> MR. WAYNE: **I'm going to file it today.**
>
> THE COURT: You want a nonsuit with prejudice or without?
>
> MR. WAYNE: **With prejudice.**
>
> Exhibit G (emphasis added).

58.    Plaintiffs' counsel made this capitulation with eleven (11) days in the Discovery

Period remaining. The short discourse speaks volumes; if the Court is going to require the

Plaintiffs' to properly defend a deposition and to do a lot more work in the next few weeks, the Plaintiffs would prefer to nonsuit their entire case with prejudice. The Plaintiffs had run the course of their delay tactics.

59.     As will be discussed below, not only were the Plaintiffs unwilling to fully prosecute their action, they in fact could not support the fraud claims at the heart of the Second Amended Complaint.

## B.     Factual Contentions Lack Evidentiary Support

60.     By signing the four (4) pleadings involved in this matter, Plaintiffs' counsel certified that the allegations and factual contentions therein had evidentiary support or will likely have such support after further discovery. See Fed.R.Bankr.P. 9011(b)(3). In reality, the Plaintiffs and their attorneys knew certain of the allegations to be false and repeatedly alleged these false statements in the pleadings and before the court at hearing.

### 1.     Non-Existent Oral Representation

61.     The most glaring abuse of Rule 9011 surrounds the repeated allegations surrounding the Debtor's purported oral misrepresentation as to the value of the Office Building. "On August 30, 2000, the Debtor . . . . orally misrepresented to Troost that the Office building was worth $4 million with the intent of inducing Troost, Mt. Hope and the LLC into accepting a proposal by Gateway to purchase the Office building at the below-market price of $4 million." (Exhibit F, ¶16).

62.     This alleged misrepresentation is at the center of the fraudulent scheme purportedly hatched by the Debtor and represents the heart of the Plaintiffs' § 523 actions pled in all three complaints. It further served as the lighting rod for the Debtors' three (3) motions to

dismiss the Plaintiffs' complaints, two (2) of which the Court granted. The Court also *sua sponte*

ordered the Plaintiffs to file a More Definite Statement to attempt to flesh out this allegation.

This underscores the flagrancy of Plaintiff's conduct in persistently advocating a false allegation.

63.    In his deposition conducted on March 3, 2004, in connection with the Gateway

Litigation and Counterclaim/Third-Party Complaint[8], Troost averred that the Debtor **never made**

**such an oral representation.**

> Q [PATRICK SHERLOCK, ESQ.]: Okay. Did Mr. Kitchin ever tell you what his opinion was of the value of the plaza?
>
> A [TROOST]: No.
>
> Q: Did Mr. Kitchin ever tell you what his opinion was concerning the value of the office building?
>
> A: Well, the whole combination was valued at about $8 million.
>
> Q: But did he tell you what he considered to be the value of the office building?
>
> A: Well, when we first purchased it, he had grandiose ideas of what it would be worth.
>
> Q: What about after you purchased it?
>
> A: Well, he seemed to indicate it was worth much less.
>
> Q: Do you recall when he made those representations?
>
> A: When we did this [Modified Sales Contract].
>
> Q: And that's when he told you it was worth $4 million?
>
> A: Yes, the combination of the two worth eight million. It states four million for the plaza and four million for the office building.

---

[8] The Debtor never had an opportunity to depose Troost in the Bankruptcy Case as result of the dismissal by the Plaintiffs with prejudice.

Q: When did he tell you that; do you recall?

A: In the agreement.

**Q: Did he tell it to you orally as well?**

**A: No, but he did the agreement.**

(Transcript of Troost Deposition (emphasis added)).  A copy of the relevant portions of the transcript are attached hereto as <u>Exhibit I</u>, and made a part hereof.

64.    **Troost's sworn testimony thus directly contradicts the allegations of the Initial Complaint, the Amended Complaint, the Second Amended Complaint and the More Definite Statement**.  The Court should note that the Counterclaim/Third-Party Complaint **does not** allege the Debtor made an oral misrepresentation to Troost.  Importantly, the $4,000,000 sales price for the Office Building was set in the Modified Sales Contract **months before the purported misrepresentation was allegedly made.**

65.    Rule 9011 seeks to ensure that frivolous or insupportable pleadings are not filed. See <u>Poterek</u>, <u>supra</u>, 169 B.R. 896, 909.  An affirmative duty thus exists for an attorney to make a reasonable inquiry into the facts at issue.  <u>See</u> <u>Id</u>.

66.    A heightened duty exists for attorneys extensively involved in a case even if a reasonable investigation conducted by an attorney unfamiliar with the case might not have resulted in that heightened level of knowledge.  <u>See</u> <u>Artco Corp. V. Lynnhaven Dry Storage Marina, Inc.</u>, 898 F. 2d 953, 956 (4th Cir. 1990)(Counsel who had been previously involved in aspects of case could not escape responsibility for his actions in filing pleading with assertion that he knew to be unfounded in fact by asserting that such denials would have been reasonable if filed by attorney unfamiliar with case who had conducted the minimum inquiry acceptable under sanctions rule).

61981.1  6/14/04                                   -24-

67.    Plaintiffs' current counsel have represented Troost and Mount Hope since at least November 2000, in connection with an attempted closing on the Office Building pursuant to the Amended Sales Contract. Plaintiffs' counsel subsequently filed the Counterclaim/Third-Party Complaint and are defending Troost and Mount Hope in the Gateway Litigation. At best, Plaintiffs' counsel failed to engage in a reasonable investigation of the facts prior to filing Initial Complaint. It appears, however, given counsel's involvement in these matters, that both Plaintiffs and their counsel knowingly violated Rule 9011 by initiating and prosecuting this adversary proceeding based on false allegations.

## 2.    **Deposit and Return of Earnest Money**

68.    The Second Amended Complaint also alleges that in connection with the Plaza sale, the Plaintiffs entrusted the Debtor with $100,000 of earnest money and that the Debtor fraudulently converted $50,000 of that earnest money. (Exhibit F, ¶¶26-30). In reality, attorney Patrick O'Malley and Realty Executives Ambassador (the LLC's listing agent) held the earnest money in escrow and returned the escrow funds in full. The Plaintiffs' were fully aware of these transactions prior to filing the Initial Complaint as evidenced by the paper trail of the transactions maintained in their attorney, Kenneth Brown's files.

69.    Attached hereto as Exhibit J, and made a part hereof, are several documents produced by Plaintiffs' attorney Kenneth Brown that bear the Bates Stamp designation "KB". These following documents trace the deposit and return of the earnest money funds and directly contradict allegations made by the Plaintiffs in paragraphs 26 through 30 of the Second Amended Complaint (See Exhibit F, ¶¶26-30):

(i)    **KB000600:** Copy of January 19, 2000 check for $50,000 issued to Patrick O'Malley and endorsed "as escrowee."

(ii)    **KB000276:** Copy of March 28, 2000 letter signed by buyers of the Plaza, indicating their deposit of the "second $50,000 earnest money."

(iii)   **KB000202:** Copy of August 8,2000 fax correspondence from the Debtor to Kenneth Brown requesting instructions for the return of the earnest money.

(iv)   **KB000203:** Copy of August 9, 2000 "Memorandum" to Frank Troost (Troost's brother and business partner) and Kenneth Brown indicating "$50,000 Earnest Money Refund Check" is enclosed.

(v)    **KB000204:** Copy of $50,000 check issued by Patrick O'Malley for "refund of earnest money deposit made 1/19/2000."

(vi)   **KB000205:** Copy of August 9,2000 "Memorandum" to Ron Duplack (attorney for the buyers) and Kenneth Brown indicating "$50,000 Earnest Money Refund Check" is enclosed "Per attorney Ken Brown's instructions."

(vii)   **KB000206:** Copy of $50,000 cashier's check issued by Realty Executives Ambassador to Ricek & Crotty (Ron Duplack's law firm) "for escrowee."

(viii)  **KB000594:** Copy of both checks shown on KB000204 and KB000206.

Exhibit J.

70.    The above documents show all Plaza earnest money funds were placed in escrow and subsequently returned in August 2000, years before the filing of the Initial Complaint. As with the alleged oral misrepresentations, Plaintiffs' allegations of converted earnest money are false and they knew them to be false prior to filing of the adversary proceeding.

**C.**    **Frivolous Legal Contentions Are Not Warranted By Existing Law**

71.    Assuming *arguendo* that the numerous patently false allegations discussed above maintained some validity, the Plaintiffs various complaints still contained frivolous legal contentions in violation of Bankruptcy Rule 9011(b)(2). The Debtor submits the legal contention

that Troost justifiably relied on the Debtor's alleged oral representation is not warranted by

existing law.

72.     The correct standard for measuring reliance for purposes of § 523(a)(2)(A) is

**justifiable reliance**.  See Field v. Mans, 516 U.S. 59, 116 S.Ct. 437 (1995).  "The type of fraud

required for purposes of § 523(a)(4) is the same as is required for § 523(a)(2)(A)".  In re D.

Verrone, 277 B.R. 66, 72 (W.D. Penn. 2002).  Although there is no duty to investigate, a creditor

who possesses "access to the truth" and has been alerted to facts that would alert to the truth may

be denied recovery of judgment for dischargeability of debt under § 523(a)(2)(A) for lack of

justifiable reliance on a purported misrepresentation.  See In re Vernon, 192 B.R. 165, 172

(Bankr.N.D. Ill. 1996)(J. Schmetterer)(citing Mayer v. Spanel International Ltd., 51 F.3d 670,

676 (7th Cir.1995)).

73.     Under the above standards, the Plaintiffs could never show that Troost justifiably

relied on the Debtor's alleged oral representations.

74.     In negotiating the Settlement Agreement for the Plaintiffs, Kenneth Brown drafted

a proposed insert to the Settlement Agreement (the "Insert").  A copy of the insert is attached

hereto as Exhibit K, and made part hereof.  Subparagraph "a" of the Insert states that "Peter

Kitchin ("Peter") has obtained a verbal appraisal of the estimated current value of the Office

Building is approximately $4,000,000 to $4,500,000."

75.     During the Brown Deposition, Kenneth Brown stated under oath that (a) he

drafted and prepared the Insert (marked as Exhibit 7 at the Brown Deposition), (b) he sent the

Insert to Bruce Salk, attorney for the Kitchin Parties in connection with the Settlement

Agreement, and (c) the Insert incorporated representations and statements purportedly made by

the Debtor while negotiating the Settlement Agreement.   (Transcript of Brown Deposition, pp.

111-115).  A copy of the relevant portions of the Brown Deposition transcript are attached hereto

as Exhibit L, and made a part hereof.

76.     The Debtor, however, expressly refused to include the Insert in the Settlement

Agreement.  Indeed, the Insert is not contained or incorporated into the Settlement Agreement at

all.  (Exhibit B).  The Settlement Agreement also contains no reference to the alleged value of the

Office Building and or to any purported appraisal of the Office Building obtained by the Debtor

or any other party.  (Exhibit B).  Similarly, the Amended Sales Contract contains no reference to

any alleged appraisal obtained by the Debtor or any other party.  A copy of the Amended Sales

Contract is attached hereto as Exhibit M, and made a part hereof.

77.     No court could find that Troost justifiably relied on an oral representation of value

after the Debtor explicitly rejected the inclusion of the same representation in writing.

78.     Notwithstanding this rejection, on August 31, 2000, Troost could not justifiably

rely on any oral representation of the Office Building's value by the Debtor for two (2)

compelling reasons: (1) Troost maintained a better position than the Debtor to know the value of

the Office Building; and (2) Troost did not trust the Debtor at that time.

79.     On April 20, 2004, Counsel for the Debtor deposed Glenn Mrjenovich

("Mrjenovich"), an accountant for Troost and his business entities for approximately twenty-five

(25) years (the "Mrjenovich Deposition").  A copy of the relevant portions of a transcript of the

Mrjenovich Deposition are attached hereto as Exhibit N, and made a part hereof.  Mrjenovich

testified to the following:

(i)     Troost currently has an financial interest in and manages the real estate owned by approximately ten (10) cemetery businesses and other real estate entities (Exhibit N, pp. 9-16);

(ii)    Prior to 2004 owned an interest in approximately ten (10) monument companies (Exhibit N, pp. 26-30);

(iii)   In the year 2000 Troost maintained a interest in the aforementioned entities, managed the real estate entities, and made the day-to-day and final decisions for them (Exhibit N, pp. 35-37);

(iv)    Troost tracks the income generated by his real estate entities, supervises the bookkeeping and reviews the bookkeeper reports for those entities (Exhibit N, pp. 37-39);

(v)     Mrjenovich's firm completes financial statements for Troost's real estate entities and sends the statements to Troost, after which Troost reviews the statements and asks questions about them (Exhibit N, pp. 39-40, 44-45);

(vi)    Troost understands the financial statements, and the concepts of profit, how profit is calculated, revenue, income, expenses, net profit and how to increase profit (Exhibit N, pp. 41-43);

(vii)   Troost historically has been able to identify specific reasons why one his operations was not profitable and has at times found errors on financial statements submitted by Mrjenovich's firm (Exhibit N, pp. 42, 46);

(viii)  Troost provided Mrjenovich's firm with the LLC's financial information, tracked the LLC's income, paid its expenses and kept possession of its books and records (Exhibit N, p. 55);

(ix)    Troost paid bills for the LLC and had knowledge of all receipts and expenses of the LLC for the years 1998-2000, and during that time engaged in hands-on management of the LLC; (Exhibit N, p. 75);

(x)     For the years 1998-2000, Troost had all the necessary financial information to obtain an appraisal of the Mokena Properties (Exhibit N, pp. 77-79); and

(xi)    Troost drafted a hand-written work paper reporting the LLC's receipts and disbursements for each year from 1998-2000. Mrjenovich's firm used these ledgers to prepare the LLC's financial statements and tax returns for the same years (Exhibit N, pp.82-95).

80.     Thus, given the extraordinary control Troost exercised over the Mokena
Properties' finances and his direct, hands-on approach to managing that real estate investment,
Troost was in a far better position than the Debtor to determine the value of the Office Building
or to obtain an appraisal of the same.  At a bare minimum, Troost possessed "access to the truth"
as contemplated in Vernon.

81.     Perhaps most damning to any plausible "justifiable reliance" argument is the fact
that Troost was not trusting of the Debtor at the time the alleged misrepresentation took place.
Again, Troost's deposition is revealing:

(i)     At the time Troost entered into the Partnership Agreement his opinion of
the Debtor's credibility "was wavering" (Exhibit I, pp. 61-62);

(ii)    In one year period following the acquisition of the Mokena Properties,
Troost became more frustrated with his dealings with the Debtor with
respect to the Mokena Properties (Exhibit I, p. 62);

(iii)   **By the summer of 1999 distrusted the Debtor more than he trusted him**
(Exhibit I, p. 77)(emphasis added);

82.     The severity of the disagreements and mistrust between Troost and the Debtor at
the time of the purported misrepresentation is evidenced by the fact they entered the Settlement
Agreement.  The Settlement Agreement is premised on the fact that "a disagreement has arisen
with respect to the Troost Parties and the Kitchin Parties regarding the development and sale of
the Plaza and Office Building."  (Exhibit B, p. 1).  It strains credulity to propose that Troost
would place blind trust in the Debtor, while at such odds with Carmel Kitchin and the Debtor
over the sale and development of multi-million dollar properties that the parties sought fit to
enter in to a written settlement agreement and provide mutual general releases.

83.    In light of the foregoing facts and admissions, Troost has no basis to allege justifiable reliance.  This Court has ruled that "where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived . . . . he is required to make an investigation of his own."  In re Vernon, supra, 192 B.R. at 172.

**C.    Plaintiffs and Their Counsel Engaged in Numerous Violations of Rule 9011**

84.    In this case the Plaintiffs have submitted four (4) pleadings in violation of Bankruptcy Rule 9011, *to wit*, the Initial Complaint, Amended Complaint, Second Amended Complaint and More Definite Statement.  A Rule 11 or Rule 9011 violation is complete when the paper in question is presented to the court "whether by signing, filing, submitting, or later advocating."  Fed.R.Civ.P. 11, Fed.R.Bankr.P. 9011; see also 10 Collier on Bankruptcy ¶9011.05[2] (15th ed. 2003)(the operative events for triggering liability under Rule 11 are "signing, filing, submitting, or later advocating" a paper that violates the rule's certification standards).  Therefore, each submission constitutes a separate and sanctionable event.

85.    Further, Plaintiffs' counsel continued to advocate the Plaintiffs' false allegations to the court on numerous occasions at various hearings, most notably at each of the hearings on the Debtors' various motions to dismiss.  The continued advocation of a meritless position represents a separate sanctionable act under Civil Procedure Rule 11.  A "litigant's obligations with respect to the contents of these papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit."

Turner v. Sungard Business Systems, Inc., 91 F.3d 1418, 1422 (11th Cir. 1996)(citing Advisory

Committee Note to Fed.R.Civ.P. 11).

86.     The Debtor submits that in this instance, the Plaintiffs' pleadings **never** had merit,

making the repeated affirmation and advocacy of their position a particularly flagrant violation.

## V.     RELIEF SOUGHT – AWARD OF SANCTIONS AND COSTS

87.     Once the Court finds that Bankruptcy Rule 9011 has been violated, sanctions are

mandatory, though the amount or type of sanction to be imposed is within Court's discretion.

See In re VIII South Michigan Associates, 175 B.R. 976, 988 (Bankr.N.D.Ill. 1994).  For the

reasons stated above, the Court must impose sanctions against Plaintiffs and their counsel for

their flagrant violations of Rule 9011.

88.     Plaintiffs' counsel must also be held accountable for their delay tactics pursuant to

11 U.S.C. § 1927.  Section 1927 allows the court to award fees and costs against attorneys who

abuse the litigation process.  "The best way to control unjustified tactics in litigations is to ensure

that those who create costs also bear them . . . . Lawyers who litigate carelessly must now take

the consequences . . . . when an attorney recklessly creates needless costs the other side is entitled

to relief."  Volpert, supra, 177 B.R. at 91 (citing In re TCI, Ltd., 769 F.2d 441, 446 (7th Cir.

1985).

89.     The Debtor hereby requests fees in an amount sufficient to compensate him for

the costs and expenses for defending this adversary proceedings, including but not limited to, (a)

responding to (i.e. answering and moving to dismiss) each of the three (3) frivolous complaints

and the More Definite Statement, (b) initiating and responding to discovery and the resulting

discovery motions, and (c) bringing this motion.   In what the Debtor considers the likely event

that the Court grants the instant Motion, the Debtor further requests a separate hearing at which

the Court may review Debtor's fee request and determine the appropriate sanctions to be imposed

on the Plaintiffs' and their counsel.

WHEREFORE, Peter T. Kitchin, by and through his undersigned attorneys, prays for the

entry of an order in accordance with the foregoing recommendations and for such other and

further relief as is just.

Dated: This 14th day of June 2004

Respectfully submitted,

PETER T. KITCHIN,
Debtor.

By: _____

One of His Attorneys

HOWARD L. ADELMAN, ESQ. (ARDC# 0015458)
NATHAN Q. RUGG, ESQ. (ARDC# 6272969)
ADELMAN & GETTLEMAN, LTD.
53 W. Jackson Blvd., Suite 1050
Chicago, IL 60604
312-435-1050

G D AND F

COPY

AGREEMENT

This Agreement is made this 6ᵗʰ day of May, 1998, by and between Carmel Investments, Inc ("CII") Mount Hope Cemetery Association, Inc. ("Mount Hope"), Carmel Kitchen ("Carmel") and Robert Troost ("Troost")

WHEREAS, CII is an Illinois corporation which has entered into an agreement to purchase the office building commonly known as 19001 LaGrange Road, Mokena, Illinois (the "Office Building"); and

WHEREAS, CII has requested that Mount Hope acquire the existing mortgage loans on the property currently held by Manufacturers Bank, the balance of which as of April 29 was One Million Three Hundred thirty Eight Thousand Three Hundred Fifty Nine and 10/100 ($1,338,359.10), including principal and accrued interest (the "Mortgages"); and

WHEREAS, CII has further requested that Mount Hope obtain a letter of credit (the "Letter of Credit") in the amount of Three Hundred Fifty Thousand Dollars ($350,000), or otherwise provide a like amount of cash for the benefit of Midwest Physicians Alliance, Inc. ("Tenant"), to guaranty the landlord's build out obligations pursuant to a proposed lease with Tenant; and

WHEREAS, Mount Hope has agreed to acquire the Mortgages and obtain the Letter of Credit or provide said cash upon the terms and conditions set forth herein; and

WHEREAS, Carmel is the sole shareholder of CII; and

WHEREAS, Troost is a shareholder of Mount Hope.

NOW THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.   Conditions Precedent to Acquiring the Mortgages.   Mount Hope's obligation to acquire the Mortgages and obtain the Letter of Credit shall be conditioned upon the following:

A.   Tenant shall have entered into a lease with the existing owner of the Office Building upon terms and conditions reasonably acceptable to Mount Hope;

A0001136.WPD                           1

B.   Chicago Title Insurance Company shall be prepared to insure Mount Hope's mortgage liens as a first and second lien against the Property, subject only to mechanic's liens in an amount acceptable to Mount Hope and such other conditions of title as shall be acceptable to Mount Hope; and

C.   CII shall have entered into a contract for the purchase of the Office Building upon terms and conditions acceptable to Mount Hope (the "Purchase Contract"), including a provision that the seller of the Office Building shall be liable for all mechanics lien claims in excess of Seven Hundred Fifty Thousand Dollars ($750,000), and (ii) including provisions with respect to the purchase of additional retail properties, that the parties have been referring to as Retail 1 and Retail 2.

Mount Hope shall contribute up to $1,700,000 for acquisition of the Mortgages and related costs. *Retail & Retail 2*

2.   Acquisition of Property.   A.   Upon acquisition of the Office Building, CII shall convey same into a land trust at Beverly Bank, fifty percent (50%) of the beneficial interest of which shall be owned by each of CII and Mount Hope.  The power of direction shall be exercise jointly by CII and Mount Hope. Failure of CII to so convey the properties to said land trusts shall be a default under the Mortgages entitling Mount Hope to exercise all of its rights and remedies thereunder.

B.   The parties acknowledge and agree that the Purchase Contract shall contain certain provisions in connection with the purchase of Retail 1 and Retail 2.  To the extent that either or both of said properties is acquired, the parties may choose to convey same into to the same land trust as the Office Building, or designate a separate land trust, but in any event, CII shall convey said properties to a land trust or trusts of which Mount Hope and CII each own fifty percent (50%), and all of the distribution and other provisions set forth herein in connection with the Office Building shall also apply to each of such additional properties.

3.   Return to Mount Hope and to Robert Tronit.   From any "net income" of the Office Building, whether from ordinary cash flow, or from the sale or refinance of the Office Building, Mount Hope shall receive an eight percent (8%) cumulative return (the "8% Return") on the amount of cash it shall have invested in the Office Building, including without limitation, the amount advanced to acquire the Mortgages, the amount advanced in connection with the build-out for Tenant and any other costs advanced (collectively, the "Mount Hope Investment").  For

G D AND F

purposes hereof, "net income" shall mean cash received from the
operation of the Office Building, including cash received from
the financing, refinancing, sale, exchange or other disposition
of all or any portion of the Property, but excluding (i)
investments or loans from CII or Mount Hope, and (ii) funds
collected as an agent or as an accommodation; less (x) cash
expended for the debts and expenses of the Office Building
(exclusive of depreciation, amortization or other expenses not
requiring the disbursement of cash), (y) cash expended in
connection with capital expenditures for the Office Building, and
(z) reasonable reserves for working capital needs and other
contingencies in connection with the Office Building.  For
purposes hereof, "cumulative" shall mean that the 8% Cumulative
Return to Mount Hope for the current calendar year as well as for
all prior calendar years must be satisfied before making
distributions of any other amounts.

After payment of the 8% Return, and as an inducement to
Mount Hope to acquire the Mortgages, net income shall be divided
equally, provided, however, that from CII's share of the net
income, the following amounts shall be distributed before any net
income may be received by CII:

(i)  The sum of Three Hundred Thirty Three Thousand
Nine Hundred Eighty Five and 38/100 Dollars ($333,985.38)
Dollars to Mount Hope; and

(ii)  An amount equal to interest at the annual rate of
eight percent (8%) on the principal amount of Two Million
Dollars ($2,000,000) from the date loaned by Robert Troost
("Troost") to Peter Kitchen ("Kitchen") for the purpose of
acquiring twenty (20) acres of real estate in Park Ridge,
Illinois until the date said principal amount shall be
repaid, provided, however, that said amount shall not exceed
the sum of Five Hundred Thousand Dollars ($500,000).

Anything herein to the contrary notwithstanding, the amounts
due pursuant to sub-paragraphs (i) and (ii) above shall be
reduced by any payments in connection therewith made to Mount
Hope and/or Troost, as the case may be, pursuant to Agreement of
even date herewith by and between Troost and Kitchen.

Upon the sale or refinancing of the Office Building, Mount
Hope shall be repaid the Mount Hope Investment, to the extent
that funds are available after the payment of the 8% Return.  To
the extent that the Mount Hope Investment shall not have been
paid from the sale or refinance of the Office Building, then to
the extent so unpaid, Mount Hope shall be repaid same upon the

G D AND F          ☎ 312 541 0155          05/1.,98  07:37 ☐ :05/06 NO:261

*Retail 1 + Retail 2*

sale or refinance of either Retail 1 or Retail 2, until the
entire Mount Hope Investment shall have been repaid.

4.  **Management.**  In connection with the management of the
Office Building, all decisions with respect thereto, including
decisions as to capital expenditures, shall be unanimous, and
Mount Hope shall be a signatory to all checking accounts kept for
such property.

5.  **Financing.**  The parties shall work together to obtain a
loan in an amount sufficient to finance the acquisition and
tenanting of the Office Building and Retail 1, the budget for
which is summarized as follows:

Pay off to Manufacturer's Bank:

| | |
|---|---|
| (a) Office Building | $1,338,359.10 |
| (b) Retail 1 | 2,561,640.90 |
| Commissions to Oak Realty | 100,000.00 |
| Payment for Office Building | |
| (Net of mortgage pay-off) | 1,501,640.90 |
| Base Build Out  (2nd fl. office) | 345,000.00 |
| Extra Build Out (2nd fl. Office) | 350,000.00 |
| Base Build Out  (4th fl. Office) | 345,000.00 |
| Lien Pay Off - Office Building | 700,000.00 |
| Lien Pay Off - Retail 1 | 400,000.00 |
| Moving tenants in Retail 1 | 100,000.00 |
| Pay for Retail 1 | |
| (Net of mortgage payment) | 0 |
| Total | $7,741,640.90 |

*Carmel + Troost agree to guaranty such financing.*

6.  **Indemnity.**  The parties acknowledge and agree that they
shall each be responsible for fifty percent (50%) of the
obligations pertaining to the Office Building and the additional
retail properties, including any financing obligations and shall
indemnify, defend and hold the other harmless to the extent that
either entity shall have contributed more cash than the other,
provided, however, that this provision shall not apply to the
Mount Hope Investment, unless and until said Investment shall be
lost.

7.  **Guaranty of Obligations.**  Carmel Kitchen, principal of
CII, hereby agrees to execute this Agreement as her agreement to
guaranty the obligations of CII hereunder and to be bound by the
terms and conditions hereof as they relate to CII.  Robert
Troost, as consideration for the payment provisions of Paragraph
3 hereof, hereby agrees to execute this Agreement as his

agreement to guaranty the obligations of Mount Hope and to be
bound by the terms and conditions hereof as they relate to Mount
Hope.

In Witness Whereof, the parties have executed this Agreement
as of the date first above written.

Carmel Investments, Inc.

By: _Carmel Kitchin_
   Its ___President___

Mount Hope Cemetery Association

By: _____
   Its _____

_____
Robert Troost

_____
Carmel Kitchen

## SETTLEMENT AGREEMENT AND MUTUAL GENERAL RELEASE

THIS SETTLEMENT AGREEMENT AND MUTUAL GENERAL RELEASE (the "Agreement") is entered into as of August 31, 2000 by and among Robert Troost, Frank Troost, RTL, Inc., Park Home Cemetery Company, Inc. and Mount Hope Cemetery Association, Inc. (collectively, the "Troost Parties") and Carmel Kitchin, Peter Kitchin, Marycrest Construction Co. and Marion Builders, Inc. (collectively, the "Kitchin Parties").

### RECITALS

WHEREAS, Carmel Kitchin and Mount Hope Cemetery Association, Inc. each own an undivided 50% interest in: (i) The Chicago Trust Company as Trustee under Trust Agreement dated May 26, 1996 and known as Trust No. 1105980 (the "Trustee"), and (ii) The Hope Carmel LLC, an Illinois limited liability company ("Hope"). Trustee is the legal title holder to two (2) commercial properties located, respectively, at 19001 Old LaGrange Road, Mokena, Illinois (the "Office Building") and 19081 Old LaGrange Road, Mokena, Illinois (the "Plaza"). The Office Building and the Plaza are sometimes hereinafter collectively referred to as the "Mokena Properties";

WHEREAS, Marion Builders, Inc. and Robert Troost each own an undivided 50% interest in LaSalle National Bank as Trustee under Trust Agreement dated March 1, 1995 and known as Trust No. 4876 (the "Grasslands Trustee"), the legal title holder to three (3) vacant lots legally described on Exhibit A attached hereto and made a part hereof;

WHEREAS, Peter Kitchin and Parkholm Cemetery Company, Inc. are the partners of Oak Creek Venture, an Illinois partnership ("Oak Creek");

WHEREAS, Mount Hope Cemetery Association, Inc. has previously entered into a certain real estate sales contract dated as of November 17, 1999 with Gateway Services of Illinois, Inc. to sell Mount Hope Cemetery Association, Inc.'s interest in the Mokena Properties, as subsequently amended to provide for the sale of Mount Hope Cemetery Association, Inc.'s interest in the Office Building only (as amended, the "Contract");

WHEREAS, a disagreement has arisen with respect to the Troost Parties and the Kitchin Parties regarding the development and sale of the Plaza and Office Building and the parties desire to resolve their differences and settle any and all disputes between themselves pursuant to the terms and provisions hereof.

NOW, THEREFORE, for good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, and in consideration of the mutual promises herein contained, the Troost Parties and the Kitchin Parties agree as follows:

1.   The foregoing recitals are true and correct and shall constitute an integral part of this Agreement. This Agreement shall be interpreted in light of the recitals.

2.   Each of the parties acknowledges that it has been represented by counsel with respect to the review and negotiation of this Agreement.

3.   Concurrent with the execution of this Agreement, Mount Hope Cemetery Association, Inc. agrees to enter into a First Amendment to the Real Estate Sales Contract with Gateway

Services of Illinois, Inc. in the form of Exhibit B attached hereto and made a part hereof, and thereafter covenants and agrees to fulfill its obligations and agreements under the Contract, as so amended.

4. Concurrent with the execution of this Agreement, Carmel Kitchin agrees to execute a direction to convey the Plaza to the Trustee in a form presented by the Troost Parties and by execution of this Agreement, authorizes Robert Roost to complete the sale of the Plaza for $3,200,000.00 upon terms and conditions acceptable to the Troost Parties in their sole discretion provided that (i) the closing of the Plaza occurs prior to the closing of the Office Building sale pursuant to the Contract, and (ii) no liability is created or arises from such sale against either Carmel Kitchin or Peter Kitchin.

5. Concurrent with the closing of the sale under the Contract, the Kitchin Parties shall cause the following to occur:

   a. Marion Builders, Inc. shall assign and transfer 100% of its interest in the Grasslands Trustee and all accounts, contract rights or other assets relating thereto to Robert Troost or his designee, free and clear of all liens, claims and encumbrances;

   b. Peter Kitchin shall assign and transfer 100% of his interest in Oak Creek and all accounts, contract rights or other assets relating thereto to Parkholm Cemetery Company, Inc., free and clear of all liens, claims and encumbrances;

   c. Carmel Kitchin shall assign and transfer to Mount Hope Cemetery Association, Inc. 100% of her interest in any recovery arising from that certain case entitled Worlds End Brewing Company v. Hope Carmel LLC, et. al. pending in the Circuit Court of Cook County, Illinois under case No. 99 CH 643 (and Carmel Kitchin shall have no liability for the costs and expenses of defending or prosecuting such action); and

   d. Carmel Kitchin shall assign and transfer 100% of her interest in Hope to Mount Hope Cemetery Association, Inc. Any and all deposits, bank account balances, contract rights or other assets of Hope shall be the sole and exclusive property of Mount Hope Cemetery Association, Inc.

6. Concurrent with the closing of the sale of Mount Hope Cemetery Association, Inc.'s interest in the Office Building in accordance with the Contract, as amended, Peter Kitchin shall:

   a. pay to Mount Hope Cemetery Association, Inc., by certified, cashiers or title company check or by wire transfer, the sum of $250,000.00; and

   b. deliver to Mount Hope Cemetery Association, Inc. an unsecured, non-interest bearing promissory note ("Note") made by Peter Kitchin and Carmel Kitchin, jointly and severally, in the amount of $50,000.00, payable to the order of Mount Hope Cemetery Association, Inc., and payable in full upon the first to occur of: (i) the sale of the Office Building by Gateway (or its nominee); (ii) the sale by Carmel Kitchin of her interest in the Office Building; or (iii) after the sale under the Contract, the subsequent refinance of the of Office Building, provided, however, the amount(s) to be paid under the Note shall in no event exceed the amounts of the cash profits or distributions actually received by Carmel Kitchin from any such sale or refinancings from time to time, until the Note is paid in full. If Carmel Kitchin never

receives cash profits or distributions as provided above, then no amounts shall be due and payable under the Note.

7.    Mount Hope Cemetery Association, Inc. and Carmel Kitchin agree that they shall each remain liable for fifty percent (50%) of any commission that may become due Realty Executives arising from the sale of the Plaza. Robert Troost and Carmel Troost each agree to execute an indemnity agreement in favor of Chicago Title Insurance Company for the purpose of inducing the title company to waive or insure over a title exception raising brokers commissions as a title exception.

8.    Concurrent with the closing of the sale of Mount Hope Cemetery Association, Inc.'s interest in the Office Building in accordance with the Contract, as amended, the Troost Parties shall secure and deliver to Peter Kitchin a release and/or termination of his guaranty of the letter of credit (the "Letter of Credit") issued by LaSalle Bank in connection with the Grasslands project. Effective at such time, the Troost Parties, jointly and severally hereby agree indemnify, defend and hold Peter Kitchin harmless from and against any liability, claim, demand or judgment brought against him and arising from or relating to the Letter of Credit.

9.    Except for Peter Kitchin's liability under the Note, concurrent with the closing of the sale of Mount Hope Cemetery Association, Inc.'s interest in the Office Building in accordance with the Contract, as amended, and further provided that the Kitchin Parties shall not be in default of this Agreement after expiration of any applicable cure or grace period, the Troost Parties shall fully and unconditionally release and forever discharge each of the Kitchin Parties and all affiliates thereof from any and all claims, causes of actions, demands, contributions, indemnities, subrogation rights, attorneys' fees, costs and expenses whatsoever, known or unknown, direct or indirect, whether in tort, contract, statutory or otherwise, at law or in equity, of whatsoever kind or nature, whether heretofore or hereafter arising, for or because of any matter or things done, omitted or suffered to be done by any of the Kitchin Parties and their affiliates prior to and including the date of execution hereof (including, without limitation, all notes, guaranties, and agreements made by any Kitchin Party with or in favor of any Troost Party) whether or not in any way directly or indirectly arising out of or in any way connected to this Agreement. Notwithstanding the above, if the sale of Mount Hope Cemetery Association, Inc.'s interest in the Office Building has not occurred as a result of a default by Mount Hope Cemetery Association, Inc. and the Kitchin Parties are not in default hereunder after expiration of any applicable cure or grace period, then the release and discharge provisions of this paragraph shall be effective and enforceable. This is intended to be a general release and shall be construed and interpreted as broadly as possible.

10.   Concurrent with the closing of the sale of Mount Hope Cemetery Association, Inc.'s interest in the Office Building in accordance with the Contract, as amended, and further provided that the Troost Parties shall not be in default of this Agreement after expiration of any applicable cure or grace period, the Kitchin Parties shall fully and unconditionally release and forever discharge each of the Troost Parties and their affiliates from any and all claims, causes of actions, demands, contributions, indemnities, subrogation rights, attorneys' fees, costs and expenses whatsoever, known or unknown, direct or indirect, whether in tort, contract, statutory or otherwise, at law or in equity, of whatsoever kind or nature, whether heretofore or hereafter arising, for or because of any matter or things done, omitted or suffered to be done by any of the Troost Parties and their affiliates prior to and including the date of execution hereof, whether or not in any way directly or indirectly arising out of or in

any way connected to this Agreement. This is intended to be a general release and shall be construed and interpreted as broadly as possible.

11. No modifications, amendments, discharge or change of this Agreement, except as otherwise provided herein, shall be valid unless the same is in writing and signed by the party against which the enforcement of such modification, amendment, discharge or change is sought.

12. The validity, meaning and effect of this Agreement shall be determined in accordance with the laws of the State of Illinois applicable to contracts made and to be performed in that state.

13. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

14. The parties hereto agree that a facsimile of this Agreement bearing the facsimile signatures of the parties, shall be deemed to be of the same force and effect as an original of a manually signed counterpart of this Agreement.

15. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, assigns, legal representatives, executors and heirs.

16. In any action brought to enforce the terms of this Agreement, the prevailing party shall be entitled to recover all costs of enforcement and litigation, including but not limited to all court costs and reasonable attorneys' fees. As used in this section, the term "prevailing party" means that party whose position is substantially upheld in a final judgment rendered in any litigation or proceeding, or, if the final judgment is appealed, that party whose position is substantially upheld by the decision of the final appellate body to consider the appeal.

17. The Kitchin Parties hereby represent and warrant to the Troost Parties that to the best of their knowledge, the Kitchin Parties have not incurred any obligations or liabilities in connection with the Mokena Properties that is or may become an obligation or liability of the Troost Parties or Hope, except as described in this Agreement or as set forth on Exhibit C attached hereto.

.18. If any party to this Agreement defaults hereunder, the non-defaulting party shall send written notice thereof to the defaulting party who shall then have ten (10) days after receipt of such notice within which to cure such default. Notices to the Troost Parties shall be sent by facsimile to c/o Robert Troost at 630/968-6741 with a copy to Kenneth Brown at 847/433-6735. Notices to the Kitchin Parties shall be sent by facsimile to c/o Peter Kitchin at 630/734-9077 with a copy to Bruce Salk at 847/480-7882. Notices shall be deemed sent on the date of confirmation of delivery by facsimile.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

_____        _Carmel M. Kitchin_
ROBERT TROOST                        CARMEL KITCHIN

_____        _[signature]_
FRANK TROOST                         PETER KITCHIN

MOUNT HOPE CEMETERY ASSOCIATION,     MARION BUILDERS, INC.
INC.

By:_____        By:_[signature]_

Its:_____        Its:_[signature]_

RTL, INC.                            MARYCREST CONSTRUCTION CO.

By:_____        By:_[signature]_

Its:_____        Its:_[signature]_

PARK HOME CEMETERY COMPANY, INC.

By:_____

Its:_____

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

_____
ROBERT TROOST

_____
CARMEL KITCHIN

_____
FRANK TROOST

_____
PETER KITCHIN

MOUNT HOPE CEMETERY ASSOCIATION, INC.

By: _____

Its: _____

MARION BUILDERS, INC.

By: _____

Its: _____

RTL, INC.

By: _____

Its: _____

MARYCREST CONSTRUCTION CO.

By: _____

Its: _____

PARKHOLM CEMETERY COMPANY, INC

By: _____

Its: _____

F/SAS/marycrestUsettleagr/82900

PETER TROOST MONUME    Fax:1 708 8 2938    '00    15:10    P. 01
06/28/00   14:20
08/28/00   13:56 FAX 847 480    COHEN, SALK EDWARD, P.C.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

_____
ROBERT TROOST

_____
FRANK TROOST

CARMEL KITCHIN
_____

PETER KITCHIN
_____

MOUNT HOPE CEMETERY ASSOCIATION, INC.

By: _____

Its: _____

MARION BUILDERS, INC.

By: _____

Its: _____

RTL, INC.

By: _____

Its: _____

MARYCREST CONSTRUCTION CO.

By: _____

Its: _____

F/BAS/marycrest/settlecgr/B2900

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
WILL COUNTY, ILLINOIS

| | |
|---|---|
| GATEWAY SERVICES OF ILLINOIS, INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>MOUNT HOPE CEMETERY ASSOCIATION, )<br>INC. AND CHICAGO TRUST COMPANY )<br>AS TRUSTEE UNDER TRUST NO. 1105980, )<br><br>Defendants. )<br><br>and )<br><br>MOUNT HOPE CEMETERY ASSOCIATION )<br>AND ROBERT TROOST, )<br><br>Counter-Plaintiff / )<br>Third Party Plaintiff )<br><br>v. )<br><br>GATEWAY SERVICES OF ILLINOIS, INC., )<br>CARMEL KITCHIN AND CARMEL )<br>INVESTMENTS, INC. )<br><br>Counter-Defendant / )<br>Third Party Defendants. ) | Case No. 01 CH 383 |

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES AND
COUNTERCLAIM OF DEFENDANTS MOUNT HOPE CEMETERY ASSOCIATION,
CHICAGO TRUST COMPANY AND OTHERS**

Defendants Mount Hope Cemetery Association, Inc. ("Mt. Hope") and Chicago Trust

Company a/t/u Trust No. 1105980 ("Chicago Trust" or "Trustee"), by and through their undersigned

attorneys, submit the following Answer, Affirmative Defenses and, in the case of Mt. Hope and

Robert Troost ("Troost"), Counterclaim in response to the complaint filed by Gateway Services of

Illinois, Inc. ("Gateway"). Mt. Hope and Troost are the Counter-Plaintiffs in the Counterclaim which

is filed against Counter-Defendants Gateway, Carmel Kitchin ("Carmel"), and Carmel Investments,

Inc. ("CII").

## MT. HOPE'S AND THE TRUSTEE'S ANSWER

### I.    GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS
OF THE COMPLAINT.

#### A. THE PARTIES

1.    Gateway Services of Illinois, Inc. is an Illinois corporation that did business with

respect to the real estate located at 19001 Old LaGrange Road, Mokena, Illinois, (hereafter the

"Mokena Property") which is the subject matter of this complaint.

**ANSWER:**    Defendants admit that Gateway is an Illinois corporation. All remaining
allegations in paragraph 1 of the Complaint are denied.

2.    Mount Hope Cemetery Association, Inc. ("Mount Hope") has its principal place of

business in the County of Cook, State of Illinois. At all times relevant hereto, Mount Hope was, and

is, the sole owner of 50% of the beneficial interest of a land trust wherein Chicago Trust Company

acts as trustee under a trust agreement dated May 28, 1998 and known as Trust No. 1105980

("Chicago Trust").

**ANSWER:**    Mt. Hope admits that its principal place of business is in Cook County,
Illinois. The Trustee admits it is the owner of certain real property under Trust No. 1105980. All
remaining allegations in paragraph 2 of the Complaint are denied.

3.    Chicago Trust is the owner of the legal title to the Mokena Property which is

improved with a four story office building.

**ANSWER:**    The allegations in paragraph 3 of the Complaint are admitted.

-2-

## B. BACKGROUND FACTS - THE REAL ESTATE SALES
## CONTRACT FOR THE MOKENA PROPERTY

4.      On or about November 17, 1999, Gateway and Mount Hope executed a contract to

sell Gateway all of Mount Hope's beneficial interest in two properties, 19001 and 19081 Old

LaGrange Road, Mokena, Illinois (the "Contract"). (Exhibit A).

**ANSWER:**    The allegations in paragraph 4 of the Complaint are denied.  Answering
further, Mt. Hope states that the document attached as Exhibit A to the Complaint speaks for itself
and makes no mention of a sale of a "beneficial interest".  Mt. Hope denies that said document
constitutes an enforceable contract either against Mt. Hope or otherwise.

5.      Sometime thereafter, the parties entered into a handwritten modification of the

November 17 contract (the "Handwritten Amendment") whereby Mount Hope agreed to not sell, and

Gateway agreed to not buy, all of Mount Hope's beneficial interest in the property at 19081 Old

LaGrange Road.  (Exhibit B).  In addition, the parties agreed that prior to December 31, 2000,

Gateway would purchase Mount Hope's beneficial interest in the Mokena Property for $4.0 million.

**ANSWER:**    The allegations in paragraph 5 of the Complaint are denied.  Answering
further, Mt. Hope states that the document attached to the Complaint as Exhibit B is not between the
"parties" to this litigation, speaks for itself, and makes no mention of the sale of a "beneficial
interest".  Mt. Hope denies that said document constitutes an enforceable contract either against Mt.
Hope or otherwise.

6.      On August 31, 2000, Mount Hope and Gateway entered into a "First Amendment to

Real Estate Sales Contract" (the "First Amendment") that modified and clarified the November 17,

1999 contract and the handwritten modification.  (Exhibit C).

**ANSWER:**    The allegations in paragraph 6 of the Complaint are denied.  Answering
further, Mt. Hope states that the allegations in paragraph 6 of the Complaint fail to identify all of the
parties to the document attached as Exhibit C to the Complaint.  Moreover, that document speaks
for itself and Mt. Hope denies the characterization sought to be placed thereon by Gateway.  Further,
Mt. Hope states that the allegations in paragraph 6 of the Complaint which refer to a "Real Estate
Sales Contract" are inconsistent with Gateway's prior allegations concerning the sale of a beneficial